James E. Cecchi
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068-1739
(973) 994-1700

Jay W. Eisenhofer
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500

Counsel for Plaintiff and the Proposed Class

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| COUNTY OF MONTGOMERY, PENNSYLVANIA, individually, and on behalf of all those similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ICAP PLC; ICAP CAPITAL MARKETS, LLC; BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; BNP PARIBAS SA; CITIGROUP, INC.; CREDIT SUISSE AG; DEUTSCHE BANK AG; THE GOLDMAN SACHS GROUP, INC.; HSBC BANK PLC; JPMORGAN CHASE & CO.; NOMURA HOLDINGS, INC.; NOMURA SECURITIES INTERNATIONAL, INC.; ROYAL BANK OF SCOTLAND PLC; UBS AG; WELLS FARGO & COMPANY; and WELLS FARGO BANK, N.A.,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT and**<br>**<u>DEMAND FOR JURY TRIAL</u>** |

# TABLE OF CONTENTS

**Page(s)**


NATURE OF THE ACTION ..... 1

PARTIES ..... 6

**A.** Plaintiff ..... 6

**B.** Defendants ..... 7

1. ICAP ..... 7

2. Bank Defendants ..... 8

a. Bank of America ..... 8

b. Barclays ..... 8

c. BNP Paribas ..... 9

d. Citigroup ..... 9

e. Credit Suisse ..... 9

f. Deutsche Bank ..... 10

g. Goldman Sachs ..... 10

h. HSBC ..... 11

i. JPMorgan ..... 11

j. Nomura ..... 12

k. RBS ..... 12

l. UBS ..... 13

m. Wells Fargo ..... 13

AGENTS AND CO-CONSPIRATORS ..... 14

JURISDICTION AND VENUE ..... 14

CLASS ACTION ALLEGATIONS ..... 15

FACTUAL ALLEGATIONS ..... 16

**A.** The Interest Rate Derivatives Market ..... 16

**B.** The ISDAFIX Rate ..... 20

THE LIBOR SCANDAL INVOLVES REGULATORY INVESTIGATIONS INTO MANIPULATION OF BENCHMARK RATES USED IN FINANCIAL INSTRUMENTS ..... 23

ICAP IS REMOVED FROM ITS ROLE AS ISDAFIX ADMINISTRATOR ..... 25

THE CONSPIRACY TO MANIPULATE THE ISDAFIX RATE ..... 25

**A.** "Banging The Close" ..... 25

**B.** Delayed Reporting ..... 28

DEFENDANTS ACTIVELY AND FRAUDULENTLY CONCEALED THEIR UNLAWFUL CONSPIRACY AND MANIPULATION ........ 29
COUNT I ........ 30
PRICE FIXING ........ 30
Section 1 of the Sherman Antitrust Act ........ 30
COUNT II ........ 31
PRICE MANIPULATION ........ 31
Violation of the Commodity Exchange Act, ........ 31
7 U.S.C. §§1 et seq. and CFTC Rule 180.1(a)) ........ 31
COUNT III ........ 32
PRINCIPAL-AGENT LIABILITY ........ 32
Violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* ........ 32
COUNT IV ........ 32
AIDING AND ABETTING ........ 32
Violation of the Commodity Exchange Act, 7 U.S.C. § 1, *et seq* ........ 32
COUNT V ........ 33
UNJUST ENRICHMENT ........ 33
DEMAND FOR JURY TRIAL ........ 35

Plaintiff, County of Montgomery, Pennsylvania, by way of Complaint against Defendants (defined below) for, among other things described below, Defendants' combination and conspiracy to fix and manipulate prices and otherwise unreasonably restrain trade and manipulate the benchmark "ISDAFIX" rate from at least January 1, 2006, through at least January 2014, and, based upon personal knowledge, information, belief, and investigation of counsel, alleges as follows:

## NATURE OF THE ACTION

1. In simplest terms, "ISDAFIX" is an interest rate. It is one of the benchmark interest rates used in a wide variety of financial instruments to fix the amount one party to a financial transaction is required to pay to the other party. The ISDAFIX rate affects pricing of, for example, interest rate swaps, swaptions and a variety of more sophisticated financial instruments and so-called "derivative" transactions.

2. An interest rate swap is a transaction in which one counterparty exchanges (*i.e.*, "swaps") a financial instrument that pays a variable (or "floating") rate of interest for a financial instrument that pays a fixed rate of interest. An interest rate swap is one of the most common forms of so-called derivative transactions (*i.e.*, so named because the newly-created swap transaction is "derived" from the underlying financial instruments that embody the fixed and floating interest payment obligations). A "swaption" is another derivative transaction where one counterparty pays the other counterparty a fee (called a "premium") in exchange for the right, but not the obligation (*i.e.*, an "option") to enter into a swap transaction on a later, specified date.

3. The ISDAFIX rate is set by the Defendant Banks (defined below). The Defendant Banks are "dealers" in interest rate swap, swaptions and other derivatives. Being a dealer means the banks arrange interest rate swap, swaptions and other transactions on behalf of their clients

(such as pension funds and state and local municipalities) that are looking to enter into such transactions. As dealers, the Defendant Banks have some awareness of the prices at which interest rate swaps and other derivative instruments are being transacted and, thus, would use that knowledge to help establish the ISDAFIX rate in a bidding process (described below).

4. The bidding process was originally intended to create an average mid-market swap rate for six currencies, including the U.S. dollar, at various maturity dates. The process was administered by Defendant ICAP (defined below), an entity that was responsible for regularly calculating and publishing ISDAFIX rates by it staff and from its offices in Jersey City, New Jersey. During the relevant time, the ISDAFIX for swap rates priced in U.S. dollars (hereafter "USD") was set between 11:00 a.m. and 11:15 a.m. Eastern Time. The process for setting the USD ISDAFIX rate was established by the International Swaps and Derivatives Association ("ISDA"), which created ISDAFIX in 1998. ICAP was supposed to set the ISDAFIX rate by calculating a "reference rate," which was the average trading rate of interest rate swaps as of 11:00 a.m. Eastern time, and then having each Defendant Bank either agree with the reference rate or, if it did not agree, submit a rate of its own. The reference rate would then be adjusted by ICAP, as necessary, according to the "bids" submitted by the Defendant Banks and the ISDAFIX rates for USD interest rate swaps of various maturities would be published. The published ISDAFIX rate would be used as a "benchmark" rate in the pricing of myriad other financial transactions.

5. The ISDAFIX rates were supposed to encapsulate a competitive bidding process whereby the dealers in the market (*i.e.*, the Defendant Banks) would use their knowledge of supply and demand in the interest rate derivatives market to set an ISDAFIX rate that was a true reflection of market conditions and the competitive process. As dealers, the Defendant Banks

compete in the interest rate derivatives market to provide the best possible terms in transactions for their clients, who are investors like Plaintiff and other members of the Class (as defined below). The ISDAFIX rate, which was based on ICAP's averaging of transaction data in the derivatives market, was intended to reflect competitive pricing information.

6. Unknown to Plaintiff and the Class, however, the process for setting the ISDAFIX rate was a sham throughout the Class Period (defined below). ICAP and the Defendant Banks corrupted the bidding process by entering into a secret conspiracy to set the ISDAFIX rates at artificial levels. Instead of engaging in true competition, the Defendant Banks colluded with one another to avoid having to pay investors what they were truly owed on interest rate derivative transactions. The secret conspiracy involved the Defendant Banks evading payment of the true amounts they owed when investors' ISDAFIX-based investments were "in-the-money" by jointly manipulating the ISDAFIX rates that were used to determine the amounts that were due to such investors. The Defendant Banks enlisted ICAP to execute their scheme, and ICAP was a willing participant.

7. More specifically, the Defendant Banks entered into the following agreement that corrupted the ISDAFIX bidding process. When any subset of banks involved in the bidding process faced particular exposure to the settlement of an ISDAFIX-based transaction on a given day, the other banks and ICAP would aid in the manipulation of USD ISDAFIX rates to an artificial level that would benefit the subset of banks, but would concomitantly hurt the banks' customers. To facilitate this scheme, the Defendant Banks communicated with each other via electronic "chat rooms" and other private communication platforms to establish when ISDAFIX manipulation was necessary and how the manipulation should be executed.

8. The manipulation took at least two main forms: (1) so-called "banging the close"; and (2) delayed reporting. Each form is described below.

9. In the first form of manipulation, the Defendant Banks conspired to manipulate the fixed swap rate just minutes before the 15-minute period in which the ISDAFIX rate was set. This was accomplished by execution of numerous rapid-fire transactions through ICAP and submission of bids and offers to ICAP to push the ISDAFIX rates to a particular level. This process was referred to as "banging the close." By executing substantial volume of transactions and submitting bids and offers in a short window just prior to ICAP releasing the initial reference rate, Defendants were able to manipulate the initial, starting rate on which ISDAFIX was based.

10. ICAP had a dual role in the "banging the close" scheme. In addition to acting as administrator in setting and publishing the ISDAFIX rate, ICAP was one of the largest interest rate derivatives brokers in the industry. Therefore, ICAP and its brokers made millions of dollars in fees and commissions by acting as a broker for the Defendant Banks and brokering their transactions in the derivatives market. In fact, ICAP's brokerage profits from its office in Jersey City, New Jersey where the ISDAFIX rate was set were so high that the office was known as "Treasure Island." Thus, ICAP assisted the Defendant Banks in the "banging the close" scheme by agreeing to publish prices for as many transactions as possible in the short window of time just prior to release of in the initial reference rate. This scheme had the effect of driving the reference rate in the direction desired by the Banks.

11. In the second form of manipulation, ICAP and the Defendant Banks would agree that ICAP would delay reporting actual swap rates until after the bidding process by which ISDAFIX was set had concluded. By doing so, Defendants manipulated the initial reference rate that ICAP would send out at the beginning of the bidding process. Even where the manipulation

on a given day involved only some of the Defendant Banks that were desirous of moving ISDAFIX rates to a particular level, given the conspiracy, those Banks could manipulate the rate with confidence that the other banks would submit bids matching the referenced rate established by ICAP and do nothing that would interfere with manipulation of the rate to the desired level.

12. Defendants' manipulation of ISDAFIX had an impact on trillions of dollars of financial instruments that are pegged to ISDAFIX. The impact on the extremely large swaptions provides an illustrative example. As noted earlier, a swaptions transaction is more complicated that a swap. In a swap transaction, one counterparty will agree with another counterparty to exchange a fixed interest rate for a floating interest rate. In a swaption transaction, by contrast, the parties negotiate an option giving one counterparty the right (but not the obligation) to enter into a swap transaction with the other counterparty on a later, specified date.

13. Oftentimes, however, the parties to the swaption do not ultimately enter into the swap transaction. Instead, the swaption parties do what is known as "cash-settling" the swaption transaction. This means the party that sold the swaption (*i.e.*, the selling party who granted the other party the right to require the seller to enter into a swap transaction on a particular date) merely pays the swaption buyer the market value of the option on the pre-specified exercise date of the swaption. In order to ascertain the market price of the option on the exercise date, the parties to the swaption transaction use the ISDAFIX rate as a benchmark.

14. The Defendant Banks, in addition to acting as dealers with respect to interest rate swap transactions, also act as swaptions dealers. Consequently, the Defendant Banks bought and sold cash settled swaptions tied to USD ISDAFIX in transactions with members of the Class. Through their conspiracy, the Defendant Banks maximized their profits when they purchased cash-settled swaptions that were "in the money." Similarly, when the Defendant Banks were

swaption sellers, they manipulated the ISDAFIX rate to minimize or avoid losses. The Defendant Banks also maximized profits and minimized losses at the expense of Class members on other interest rate derivatives besides swaptions.

15. Defendants' unlawful conspiracy was secret for years until it began to be revealed in early 2013, when press reports revealed that government regulators were investigating the conspiracy. Press reports in April 2013 revealed that the Commodity Futures Trading Commission ("CFTC") was investigating price manipulation by ICAP and had issued subpoenas to ICAP brokers and employees at the Defendant Banks. In August 2013, it was reported that the United Kingdom's Financial Conduct Authority ("FCA") had joined the investigation and that recorded telephone calls and emails reviewed by the CFTC show that traders at Defendant Banks instructed ICAP brokers to buy or sell as many interest rate swaps as necessary to move the ISDAFIX rate to a pre-determined level.

16. As the government investigations were commencing, several banks sharply curtailed or ceased completely their involvement in setting ISDAFIX rates. In January 2014, ISDA removed ICAP from its role as administrator of the USD ISDAFIX rates due to ICAP's involvement in the conspiracy.

17. Plaintiff and the Class suffered injuries with respect interest rate derivatives transactions that were based on ISDAFIX that likely total billions of dollars.

## PARTIES

### A. PLAINTIFF

18. Plaintiff County of Montgomery, Pennsylvania, is a political subdivision organized under the laws of the Commonwealth of Pennsylvania, with offices located in Norristown, Pennsylvania.

19. Plaintiff transacted with one of the Defendant Banks in interest rate derivatives that were tied to or directly affected by ISDAFIX.

20. Defendants' manipulative conduct and conspiracy, and overt acts in furtherance thereof, directly, proximately, and materially caused injury to Plaintiff in its business or property.

**B. DEFENDANTS**

**1. ICAP**

21. Defendant ICAP plc is a company organized and existing under English law, with its principal place of business at 2 Broadgate. London, EC2M 7UR and has an office located at Harborside Financial Center, 1100 Plaza Five, Jersey City, New Jersey 07311, where, among other things, its employees set the USD ISDAFIX rate and disseminated communications regarding the rate.

22. Defendant ICAP Capital Markets LLP is a Delaware corporation and wholly owned subsidiary of ICAP Broking Holdings North America LLC which is a wholly owned subsidiary of Defendant ICAP plc, with its principal place of business located at Harborside Financial Center, 1100 Plaza Five, Jersey City, New Jersey 07311, where, among other things, its employees set the USD ISDAFIX rate and disseminated communications regarding the rate.

23. As used herein, "ICAP" includes Defendant ICAP plc and its subsidiaries and affiliates, including, without limitation, ICAP Capital Markets LLC, a Delaware corporation with its principal place of business located in Jersey City, New Jersey. ICAP Capital Markets LLC was the collection agent for ISDAFIX panel bank submissions in U.S. dollars up until January 2014.

24. During the Class Period and until January 26, 2014, ICAP served as the administrator for the setting of the USD ISDAFIX rate and as a broker for billions, if not trillions, of dollars of interest rate derivative transactions.

**2. Bank Defendants**

25. BOA, Barclays, BNP, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, HSBC, JP Morgan, Nomura, RBS, UBS and Wells Fargo, each as defined below, are sometimes referred to collectively herein as the "Bank Defendants."

**a. Bank of America**

26. Defendant Bank of America Corporation ("BOA") is a Delaware corporation with its principal place of business located at 100 North Tryon Street, Charlotte, North Carolina 28255. As used in this Complaint, BOA includes Defendant Bank of America Corporation and each of its subsidiaries and affiliates.

27. BOA maintains offices in New Jersey and transacts business in this District.

28. During the relevant time, BOA was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**b. Barclays**

29. Defendant Barclays Bank plc ("Barclays") is a public limited company organized in the United Kingdom with its principal place of business located at 1 Churchill Place, London, E14 5HP. As used in this Complaint, Barclays includes Defendant Barclays Bank plc and each of its subsidiaries and affiliates.

30. Barclays maintains offices in New Jersey and transacts business in this District.

31. During the relevant time, Barclays was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**c. BNP Paribas**

32. Defendant BNP Paribas SA ("BNP") is a company organized and existing under the laws of France with its principal place of business located at 16 Blvd. des Italiens, Paris, 75009. As used in this Complaint, BNP includes Defendant BNP Paribas SA and each of its subsidiaries and affiliates.

33. BNP maintains offices in New Jersey and transacts business in this District.

34. During the relevant time, BNP was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**d. Citigroup**

35. Defendant Citigroup, Inc. ("Citigroup") is a Delaware corporation with its principal place of business located 399 Park Avenue, New York, New York 10022. As used in this Complaint, Citigroup includes Defendant Citigroup, Inc. and each of its subsidiaries and affiliates.

36. Citigroup maintains offices in New Jersey and transacts business in this District.

37. During the relevant time, Citigroup was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**e. Credit Suisse**

38. Defendant Credit Suisse AG ("Credit Suisse") is a company organized and existing under the laws of Switzerland with its principal place of business located at

Uetiberstrasse 231, CH 8070 Zurich. As used in this Complaint, Credit Suisse includes Defendant Credit Suisse AG and each of its subsidiaries and affiliates.

39. Credit Suisse maintains offices in New Jersey and transacts business in this District.

40. During the relevant time, Credit Suisse was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**f. Deutsche Bank**

41. Defendant Deutsche Bank AG ("Deutsche Bank") is a company organized and existing under the laws of Germany with its principal place of business located at Taunusanlage 12, 60325 Frankfurt. As used in this Complaint, Deutsche Bank includes Defendant Deutsche Bank AG and each of its subsidiaries and affiliates.

42. Deutsche Bank maintains offices in New Jersey and transacts business in this District.

43. During the relevant time, Deutsche Bank was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**g. Goldman Sachs**

44. Defendant The Goldman Sachs Group, Inc. ("Goldman Sachs") is a Delaware corporation with its principal place of business located at 200 West Street, New York, New York 10282. As used in this Complaint, Goldman Sachs includes The Goldman Sachs Group, Inc. and each of its subsidiaries and affiliates.

45. Goldman Sachs maintains offices in New Jersey and transacts business in this District.

46. During the relevant time, Goldman Sachs was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**h. HSBC**

47. Defendant HSBC Bank plc ("HSBC") is a company organized and existing under the laws of the United Kingdom with its principal place of business located at 8 Canada Square, Canary Wharf, London E14 5HQ. As used in this Complaint, HSBC includes Defendant HSBC Bank plc and each of its subsidiaries and affiliates.

48. HSBC maintains offices in New Jersey and transacts business in this District.

49. During the relevant time, HSBC was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**i. JPMorgan**

50. Defendant JPMorgan Chase & Co. ("JPMorgan") is a Delaware corporation with its principal place of business located at 270 Park Avenue, New York, New York 10017. As used in this Complaint, JP Morgan includes Defendant JPMorgan Chase & Co. and each of its subsidiaries and affiliates.

51. JPMorgan maintains offices in New Jersey and transacts business in this District.

52. During the relevant time, JPMorgan was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**j. Nomura**

53. Defendant Nomura Holdings, Inc. ("Nomura") is a company organized and existing under the laws of Japan with its principal place of business located 1-9-1 Nihonbashi, Chuo-ku, Tokyo 103-8645, Japan. As used in this Complaint, "Nomura" includes Defendant Nomura Holdings, Inc. and each of its subsidiaries and affiliates, including without limitation Defendant Nomura Securities International, Inc.

54. Defendant Nomura Securities International, Inc. is a New York corporation and wholly-owned subsidiary of Nomura Holding America, Inc. and ultimately Defendant Nomura Holdings, Inc., with its principal place of business located at Worldwide Plaza, 309 West 49th Street, New York, New York 10019.

55. Nomura maintains offices in New Jersey and transacts business in this District.

56. During the relevant time, Nomura was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**k. RBS**

57. Defendant Royal Bank of Scotland plc ("RBS") is a company organized and existing under the laws of the United Kingdom with its principal place of business located 36 St. Andrew Square, Edinburgh, United Kingdom EH2 2YB. As used in this Complaint, RBS includes Defendant Royal Bank of Scotland plc and each of its subsidiaries and affiliates.

58. RBS maintains offices in New Jersey and transacts business in this District.

59. During the relevant time, RBS was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**l. UBS**

60. Defendant UBS AG ("UBS") is a company organized and existing under the laws of Switzerland with its principal place of business located at Bahnhofstr 45, CH-8098 Zurich. As used in this Complaint, UBS includes Defendant UBS AG and each of its subsidiaries and affiliates.

61. UBS maintains offices in New Jersey and transacts business in this District.

62. During the relevant time, UBS was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

**m. Wells Fargo**

63. Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business located at 420 Montgomery Street, San Francisco, California 94163. As used in this Complaint, Wells Fargo includes Defendant Wells Fargo & Company and each of its subsidiaries and affiliates.

64. Defendant Wells Fargo Bank, N.A. is a national association and the primary operating subsidiary of Defendant Wells Fargo & Co., with 90% of the assets of the parent and its principal place of business located at 101 North Phillips Avenue, One Wachovia Center, Sioux Falls, SD 57104.

65. Wells Fargo maintains offices in New Jersey and transacts business in this District.

66. During the relevant time, Wells Fargo was a contributor to the setting of the ISDAFIX rate, and also engaged in interest rate derivative transactions with members of the Class.

## AGENTS AND CO-CONSPIRATORS

67. Other entities and individuals unknown to Plaintiff at this time participated as coconspirators and performed acts in furtherance of the conspiracy.

68. Whenever reference is made to any act, deed, or transaction of any company, corporation or partnership, the allegation means that the company, corporation or partnership engaged in the act, deed or transaction by or through its officers, directors, agents, employees, partners, representatives, parent, predecessors or successors-in-interest while they were actually engaged in the management, direction, control or transaction of business or affairs of the company, corporation or partnership.

## JURISDICTION AND VENUE

69. This action arises under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 & 16 of the Clayton Antitrust Act, 15 U.S.C. §§ 15 & 26, and Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25.

70. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1337(a), and under 15 U.S.C. §§ 15(a) & 26, and Section 22 of the CEA, 7 U.S.C. § 25.

71. Venue is proper in this District under 7 U.S.C. § 25, 15 U.S.C. §§ 15(a) & 22, and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period, Defendants resided, transacted business, were found, or had agents in the United States, including in this District, and a substantial portion of the alleged activity affected interstate trade and commerce, including in this District.

72. Defendants' conduct was within the flow of, was intended to, and did, in fact, have a substantial effect on the interstate commerce of the United States. During the Class Period, Defendants used the instrumentalities of interstate commerce, including interstate wires, in furtherance of their illegal scheme.

73. This Court has personal jurisdiction over each Defendant, because each Defendant transacted business, maintained substantial contacts, is located and/or they or their coconspirators committed overt acts in furtherance of their illegal conspiracy, in the United States, including in this District. The scheme was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business in the United States, including in this District.

## CLASS ACTION ALLEGATIONS

74. Plaintiff brings this action on behalf of itself and, under Rules 23(a) and (b) of the Federal Rules of Civil Procedure, on behalf of a class (the "Class") defined as follows:

> All persons who, beginning as early as January 1, 2006 and continuing to and including January 2014 (the "Class Period"), transacted in interest rate derivatives, including interest rate swap transactions and swaption transactions, or transacted in financial instruments, that were priced, valued, settled, pegged or transacted with reference to U.S. Dollar ISDAFIX rates and/or that were executed shortly before, during, or shortly after the time of the daily ISDAFIX rate polling window of time.

75. Excluded from the Class are Defendants and their employees, subsidiaries, affiliates, parents, partners, and co-conspirators, whether or not named in this Complaint.

76. Members of the Class are so numerous and geographically dispersed that joinder is impracticable. Further, the Class is readily identifiable from information and records in the possession of Defendants.

77. Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and members of the Class were damaged by the same wrongful conduct of Defendants.

78. Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class.

79. Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation.

80. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members, thereby making damages with respect to the Class as a whole appropriate. Questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants fixed and manipulated ISDAFIX;

b. The length of the conspiracy;

c. Damages resulting from the conspiracy;

d. Whether Defendants' conduct violated the Commodity Exchange Act;

e. Whether Defendants were unjustly enriched at the expense of Class members; and

f. Whether Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

81. Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort or expense that numerous individual actions would require. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties in management of this class action.

82. Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## FACTUAL ALLEGATIONS

### A. THE INTEREST RATE DERIVATIVES MARKET

83. A "derivative" is a financial instrument whose value depends on the valuation of an underlying asset, such as a commodity (*e.g.*, gold), a corporate bond or a share of stock. The primary purpose of derivatives is to allow investors to isolate risks attendant to the underlying asset and transfer those risks to others. Interest rate risk (*i.e.*, the possibility that interest rates will move in an unfavorable direction) is one example of a risk that an investor often tries to transfer out of his or her investment portfolio. A simple example is a small business that originally obtained an adjustable (or floating) rate loan. At the time the loan was obtained, the small business owner obtained better financial terms under then-existing market conditions than he would have received if he had obtained the same loan with a fixed rate of interest. However, unlike if he had obtained a fixed rate loan, the small business owner is subject to the risk that in the future interest rates will rise and, thus, the amount due on his adjustable rate loan will be higher in the future than it is today. The small business owner may seek to enter into a separate transaction (sometimes simultaneously with the original transaction but often times several years after the original loan transaction was completed) that will offset the risk that interest rates may go up. Such offsetting transactions are commonly referred to as "hedging one's downside risk" or a "hedge" transaction. An interest rate swap is one form of such a hedging transaction using a derivative. In fact, the interest rate derivatives market is the largest derivatives market in the world.

84. The types of interest rate derivatives vary. The most "plain vanilla" one is the interest rate swap – a transaction where, as noted previously, one party will exchange (or swap) interest rate payments on a so-called "notional amount" for a fixed period of time. In the usual case, one party will pay the other party a fixed interest rate on the notional amount of the swap (in other words, the periodic payments due under the terms of the swap remain constant), while

the other party will pay a variable (or "floating") interest rate that is linked to a benchmark interest rate, such as the London Interbank Offered Rate ("LIBOR").

85. ISDA is the trade association that oversees the over-the-counter derivatives marketplace. The market is massive, as the estimated notional amounts of interest rate swaps outstanding in, for example, 2012 was well in excess of $300 trillion.

86. Another common interest rate derivative is the swaption. As noted earlier, in a swaption transaction, the parties negotiate an option giving one counterparty the right (but not the obligation) to enter into a swap transaction with the other counterparty on a later, specified date. In exchange for the option, the buyer of the swaption pays the seller a "premium."

87. The swaption contract documentation specifies the terms of the transaction. The parties will choose whether the swaption is to be cash-settled or physically settled. If the swaption is exercised, physical settlement means that the parties to the swaption will actually enter into the underlying swap. If, instead, the parties decide on cash settlement after the option is exercised, the swaption seller simply pays the swaption buyer the difference in value between the underlying swap transaction and an "open market" swap transaction (*i.e.*, a comparable transaction that is available on the open market as of the date the swaption was exercised).

88. What the parties to the swaption will do under given circumstances is influenced in large part by whether the cash-settled swaption is "in-the-money" or "out-of-the money." To determine this, the swaption is often valued by comparing the fixed rate called for in the swap transaction underlying the swaption to the fixed rate that is then available in the market for an equivalent swap. The benchmark to which the marketplace most commonly looks for evaluating this is ISDAFIX. On the exercise date of a swaption, therefore, the parties will compare the

swaption's fixed rate to the ISDAFIX rate on the exercise date to ascertain whether the swaption is in-the-money or out-of-the-money and, if it is in-the-money, by how much.

89. A swaption is in-the-money if the fixed rate available in the open market is higher than the fixed rate called for by the terms of the swaption. From the perspective of the buyer of the swaption, the option is in-the-money because if the buyer exercised the option, the buyer would be paying less to enter into the swap transaction than the then-prevailing market rate. If the swaption is in-the-money, the swaption's value increases as the ISDAFIX rate widens further from the fixed rate specified in the swaption. As a consequence, accurate and *bona fide* calculation of the ISDAFIX rate was necessary to the accurate and fair settlement of swaption transactions.

90. The manipulation of ISDAFIX rates also adversely impacted swaptions that were settled physically. This is so because a swaption holder's decision whether to exercise a swaption is based on the holder's assumption that the ISDAFIX rate accurately represents an un-manipulated rate of then-available market rate swaps. A swaption holder with physical settlement looming may choose to exercise the swaption if the fixed rate specified for the swap transaction underlying the swaption is better than fixed rates that are then-prevailing in the market on the exercise date. If, however, ISDAFIX rates have been manipulated unbeknownst to the option holder, the holder does not possess a true and *bona fide* assessment of market value. Thus, the holder may decide incorrectly (and to his detriment) to exercise or not exercise the option, which may result in financial loss.

91. Swaptions and interest rate swaps are not the only derivatives that were affected by Defendants' scheme. There are myriad other financial instruments that reference ISDAFIX rates, including "steepeners," "inverse floaters," "snowballs" and swap futures, among others,

and ISDAFIX is reportedly used in pricing structured notes and bonds and in valuing commercial real estate portfolios. In addition, the Chicago Mercantile Exchange and the Chicago Board of Trade also use ISDAFIX as the settlement price in their swap futures contracts, and the Federal Reserve uses ISDAFIX as the source for USD swap rates in its H.15 Statistical Release.

92. All of the manipulated ISDAFIX transactions were completed in the over-the-counter ("OTC") market because there is no centralized exchange for swaps and other derivatives, like the New York Stock Exchange for stocks. In the OTC market, inter-dealer brokers like ICAP are critical to the orderly functioning of the market. Such brokers, in exchange for fees and commissions, ostensibly improve market efficiency by matching buyers and sellers. A small group of brokers, including ICAP, handle the vast majority of the transactions in this OTC market. Therefore, market participants have few options if they want to transact in this market.

93. In addition to being a broker, ICAP also controlled an electronic screen known as "19901." This screen publicized and disseminated the bid/offer rates of swap transactions executed through ICAP, and was subscribed to by thousands of financial companies and other market participant who relied on the data from this screen to value swaptions, interest rate swaps and other financial products. Screen 19901 was updated periodically throughout the day.

## B. THE ISDAFIX RATE

94. As explained above, ISDAFIX is one of the key benchmark rates for an array of interest rate derivatives, swaptions and other financial instruments. ISDA first established ISDAFIX in 1998 to be a benchmark rate for the settlement of interest rate swap transactions, particularly cash-settled swaptions. The ISDAFIX rate is intended to represent an average mid-

market fixed interest rate that an OTC dealer in the derivatives market can quote for a swap transaction.

95. If ISDAFIX had not been established, investors in the OTC derivatives market would have to make inquiries with several dealers and/or brokers to value a swaption or other derivative financial instrument. As stated earlier, there is no exchange (like the New York Stock Exchange for stocks) where market prices for such instruments are readily available. ISDAFIX was many times the only available reference rate for investors who were seeking to settle interest rate derivatives, swaptions and otherwise value other derivative financial instruments. In 2006, ISDA adopted the 2006 ISDA Definitions and made ISDAFIX a default benchmark rate for calculating the value of swaption that has been cash-settled.

96. As explained in a November 29, 2012 ISDA response letter to the European Commission's Public Consultation on the Regulation of Indices (the "ISDA/European Commission Letter"), a contributor to the ISDAFIX rate "is asked to provide a rate which is the mean of where that dealer would itself offer and bid a swap in the relevant maturity for a notional equivalent amount of US$50 million or whatever amount is deemed market size in that currency for that tenor to an acknowledged dealer of good credit in the swap market. The rate should not be where the dealer sees mid-market away from itself, but should be a function of its own bid/offer spread."

97. Swaps that use the ISDAFIX rate have maturities varying from 1 year to as many as 30 years. ISDAFIX rates are expressed as a percentage to three decimal places (for example, 5.115%). The rates are distributed to investors who subscribe to electronic screen services provided by Thomson Reuters. These screens are known as ISDAFIX 1 through ISDAFIX 5, and cover various major currencies, including USD.

98. During the relevant time, ICAP calculated all USD ISDAFIX rates, while Thomson Reuters was responsible for rates in other currencies.

99. The USD ISDAFIX rate was calculated based on submissions by contributor banks (*i.e.*, the Defendant Banks) during a 15 minute "polling window." According to the ISDA/European Commission Letter, the process worked as follows:

> ICAP collects spread information from contributors via a secure website that contributors log into every morning. Contributors are asked to indicate the USD swap spread as of 11:00 am, in accordance with the criteria set by ISDA…. At 10:58 am, ICAP will send an email reminder to each contributor reminding them to contribute. At 11:02 am, ICAP will indicate on the secure website a USD swap spread and USD swap rate to serve as a reference point for contributors. This reference point is generated from two sources of information:
>
> (1) Information contained on Reuters page 19901 at 11:00 am, which reflects the most recent swap spreads from completed trades and executable bids and offers in market size done/posted at ICAP.
>
> (2) Information reflecting executed trades and executable bids and offers at 11 a.m. for US Treasury securities from ICAP's BrokerTec US Treasury electronic trading platform.
>
> By their nature, because both sources of information reflect completed transactions and/or at-risk trading interest, ICAP considers them to be a useful and meaningful reference point for where the market may be at that point in time.
>
> From 11:00 am to 11:15 am, contributors are able to submit their swap spread information and rate to the secure website. In terms of process, contributors may accept the reference swap spread and/or rate indicated on the website, or submit different values. During this time the ICAP swaps desk monitors dealer participation to ensure that the 10-bank minimum is met. As contributors submit spread and rate information, the values are sent to Thomson Reuters on a streaming basis.
>
> At 11:26 am, Thomson Reuters will calculate the USD ISDA FIX rate by eliminating a given number of the highest and lowest rates submitted, and then by calculating a simple average of the remaining rates. A rate will be posted as long as the Minimum Number of Contributions is received.

100. The USD ISDAFIX rate was then published on ISDAFIX screen 3.

**THE LIBOR SCANDAL INVOLVES REGULATORY INVESTIGATIONS INTO MANIPULATION OF BENCHMARK RATES USED IN FINANCIAL INSTRUMENTS**

101. The CFTC and other regulatory investigations into potential rate rigging and manipulation of the ISDAFIX rate grew out of, in part, regulatory investigations involving the LIBOR scandal. After media reports first exposed the manipulation of LIBOR by panel banks,[1] regulatory agencies and criminal authorities began investigations into whether the panel banks had colluded to manipulate the LIBOR rate. Criminal and civil charges were filed, and government agencies from the United States, Europe, the United Kingdom and elsewhere were involved.

102. The LIBOR investigation continues but has already resulted in evidence that some of the Defendant Banks colluded to manipulate LIBOR rates for their own benefit. Traders at some of the Defendant Banks would use emails and other electronic communications to inform their fellow employees in which direction they would like LIBOR rates to be artificially pushed in order to make profits for the banks. Third-party dealers and brokers were also involved in the LIBOR manipulation.

103. UBS and Barclays, for example, settled LIBOR manipulation claims and agreed to pay substantial fines.

104. ICAP was also a big player in the LIBOR scandal and in 2013 reached a settlement of a CFTC investigation relating to its involvement in which ICAP paid in excess of $80 million. The CFTC's investigation concluded that ICAP "knowingly disseminated false and misleading information concerning Yen borrowing rates to market participants in attempts to manipulate, at times successfully, the official fixing of the daily Yen LIBOR [rate]."

[1] In brief, the LIBOR scandal involved the manipulation of the benchmark LIBOR rate that is used in a wide variety of financial instruments. Similar to the manipulation of ISDAFIX, panel banks made submissions that were used to calculate the LIBOR rate, but, unbeknownst to investors, the bank's submissions were rigged by the panel banks.

105. Early in 2013, CFTC Commissioner Bart Chilton issued a statement to the International Roundtable on Financial Benchmarks, providing in part:

> I'm pleased we are discussing the critically important topic of benchmarks. We've witnessed blatant and brazen monkeying with the marks. . . . . the idea that pervasive manipulation, or attempted manipulation, is so widespread should make us all query the veracity of the other key marks. What about energy, swaps, the gold and silver fixes in London and the whole litany of "bors?" Why would they be any different in the minds of those that may have sought to push or pull rates? For me, this means every single mark needs to be reviewed, and potentially investigated.[2]

106. Commissioner Chilton followed up on these remarks, stating: "Given what we have seen in Libor, we'd be foolish to assume that other benchmarks aren't venues that deserve review."[3]

107. Behind the scenes, the CFTC had turned its attention to manipulation of ISDAFIX in the wake of the LIBOR scandal. So did other regulators such as the U.K. Financial Conduct Authority. Although the investigations are ongoing, they are already turning up similar evidence of manipulation as in the LIBOR scandal – specifically, emails, telephone recordings and other evidence showing that bankers and brokers were working in concert to manipulate the ISDAFIX rate for their own financial benefit.

108. Press reports in April, 2013 revealed that the CFTC had issued subpoenas relating to ISDAFIX. The CFTC was reported to be probing, among other things, whether ICAP brokers delayed updating rate-swap prices on the 19901 screen after they facilitate a trade between banks. Subsequent media reports in September 2013 revealed that recorded telephone calls and

---

[2] Statement of Commissioner Bart Chilton Before the International Roundtable on Financial Benchmarks, Washington, D.C. (February 26, 2013), at http://www.cftc.gov/PressRoom/SpeechesTestimony/chiltonstatement022613 (emphasis added).

[3] *CFTC's Chilton Says 'Foolish' Not to Review Benchmark Pricing*, BLOOMBERG (Mar. 14, 2013), at http://www.bloomberg.com/news/2013-03-14/cftc-s-chilton-says-foolish-not-to-review-benchmark-pricing.html.

emails reviewed by the CFTC show that traders at Wall Street banks instructed ICAP brokers to buy or sell as many interest rate swaps as necessary to move ISDAFIX to a pre-determined level.

**ICAP IS REMOVED FROM ITS ROLE AS ISDAFIX ADMINISTRATOR**

109. The regulatory investigations into manipulation of ISDAFIX led to ICAP's removal administrator of USD ISDAFIX.

110. In January 2014, the press reported that ISDA had announced sweeping changes to calculation of the ISDAFIX rate and that ICAP would no longer be administrator. ISDA then assumed a role as temporary administrator.

111. In August 2014, ISDA announced that ICE Benchmark Administration Limited (IBA) formally assumed the role of ISDAFIX administrator for USD and other currencies, and that ISDAFIX will no longer be set by a "polled rate," but rather will be "based on tradable quotes on regulated trading venues."

**THE CONSPIRACY TO MANIPULATE THE ISDAFIX RATE**

112. During the Class Period, the Defendant Banks and ICAP engaged in a conspiracy to manipulate the ISDAFIX benchmark rate. This was done for the purpose of obtaining extraordinary profits on interest rate derivative transactions for themselves, while resulting in damage to the banks' clients.

113. As summarized above and stated below, the conspiracy and manipulation involved at least two activities: (1) "banging the close"; and (2) delayed reporting.

**A. "BANGING THE CLOSE"**

114. During the Class Period, Defendants engaged in an activity referred to as "banging the close." This was a manipulative trading conspiracy designed to artificially drive ISDAFIX rates to desired levels just minutes before the ISDAFIX polling window.

115. As discussed earlier, the ISDAFIX bidding process started with ICAP disseminating a reference rate to the Defendant Banks so that the banks could make submissions in accordance with the practice established by ISDA. The initial reference rate was created based on the bids and offers for swaps submitted by OTC dealers (*i.e.*, the Defendant Banks) and trades brokered by ICAP, one of the largest brokers in the market.

116. The Defendants' conspiracy involved manipulating the actual swap rate immediately prior to the ISDAFIX polling window for the purpose of driving the initial reference rate (which ultimately would be sent to the Defendant Banks to confirm or deny) to a particular rate. By steering the reference rate to a particular level, the Defendant Banks caused the polling process which set the ultimate ISDAFIX rate to start at an artificial level. The Defendant Banks would execute multiple rapid-fire trades and submit bids and offers that did not truly reflect trading in the marketplace, but instead were artificial trades and/or bids/offers designed to drive ISDAFIX rates to the level that benefitted the banks.

117. The agreed-upon conspiracy was reached through multiple agreements among the Defendant Banks' traders and employees. These agreements were executed through emails, telephone calls, chat-rooms, instant messaging and/or other communications between swaption and other derivative traders and other employees who worked at the Defendant Banks. Via these communications, these traders and employees agreed on the levels to which they would work in concert to drive swaps rates in the desired direction.

118. After these agreements were reached, traders and other employees at the Defendant Banks would have other interest rate swap and/or other derivatives traders execute manipulative trades through ICAP's Jersey City, New Jersey office and submit to ICAP bids and offers that would move the rate in the desired direction. According to an August 2, 2013 article

by Matthew Leising on Bloomberg.com (the "August 2, 2013 Leising Article"), anonymous sources reported that "the swaption traders [at banks] told their interest-rate swap colleagues the level at which they needed ISDAfix to be set that day in order to bolster the value of their derivatives positions before these were settled the next day….The rate-swap trader would then tell a broker at ICAP, the biggest arranger of contracts between banks, to execute as many trades in interest-rate swaps as necessary to move ISDAfix to the desired level. This would be done just before 11 a.m…., the time when current trades are used to create reference points that help determine the final ISDAfix rates…."

119. According to an August 7, 2013 article by Matthew Leising on Bloomberg.com (the "August 7, 2013 Leising Article"), "[b]y rigging the measure [i.e., ISDAFIX], the banks stood to profit on separate derivatives trades known as swaptions…that they had with clients who were seeking to hedge against moves in interest rates." According to a source interviewed for the August 7, 2013 Leising Aricle, "Banks sought to change the value of the swaps because the ISDAfix rate sets swaptions prices…."

120. ICAP and its brokers had great incentive to join the conspiracy, as they did, because they received commissions on trades that were executed to move the ISDAFIX rate and participating in the conspiracy would generate greater order flow from the Defendant Banks. Thus, ICAP and its Jersey City brokers profited from the trades that were executed to move the rate in the desired direction. According to sources cited in the August 2, 2013 Leising Article, the team of 20 or so brokers at the ICAP Jersey City office known as "Treasure Island" made $100 million to $120 million annually for ICAP in or around 2008 and 2009. Treasure Island brokers were paid as much as $7 million a year at the market's peak, according to knowledgeable people interviewed for the August 2, 2013 Leising Article.

### B. DELAYED REPORTING

121. The second way the Defendants manipulated ISDAFIX rates was through a conspiracy with ICAP in which ICAP delayed entry of swap transactions on "Screen 19901" until the ISDAFIX polling window had closed. The purpose of this concerted activity was to prevent movements of the swap rate before the close of the ISDAFIX bidding process that would not be in the desired direction.

122. If a bank wants to engage in an interest rate swap transaction with another dealer in the OTC market, they will typically use ICAP, a derivatives broker. ICAP's brokers enter swap rates manually onto a computer screen, which is ultimately published. When ICAP brokers report a swap rate for a transaction, it is typically reported on "Screen 19901" in real time. However, the Defendant Banks conspired with ICAP to delay the publication of rates for certain interest rate derivative transactions. The delayed reporting was done for unfavorable transactions that would drive the swap rate in the opposite direction from the direction the Defendant Banks had conspired to move the rate.

123. More specifically, when the Defendant Banks (or a subset of them) wanted to drive the ISDAFIX rate in a particular direction, they would instruct ICAP's brokers to delay publication of transactions that were viewed as unfavorable to the desired direction. Through this conspiracy to delay reporting until shortly after 11 a.m., the Defendants were able to fix it so that unfavorable transactions would not have an effect on the ISDAFIX reference rate.

124. A former ICAP broker confirmed this practice, according to an April 10, 2013 article by Matthew Leising on Bloomberg.com (the "April 10, 2013 Leising Article"), which states: "ICAP enters the prices manually onto the screen. That allows dealers to tell the brokers to delay putting trades into the system instead of in real time, according to the former [ICAP]

broker, who said he witnessed such activity first-hand." As a consequence of these conspiratorial activities, the ISDAFIX rate was artificial and did not truly reflect actual market prices.

125. The April 10, 2013 Leising Article also confirms that the CFTC is examining these delayed reporting activities and that the "stale prices can potentially boost profits for banks in a market where trades are tied to tens of millions of dollars at a time."

126. A subsequent April 15, 2013 article by Matthew Leising on Bloomberg.com (the "April 15, 2013 Leising Article") also confirms how profitable this delayed reporting manipulation can be. The April 15, 2013 Leising Article states: "Banks can earns millions in profit by convincing ICAP brokers to delay when they enter…trades into the 19901 screen, according to a former ICAP broker who asked not to be identified for fear of retribution. If such a delay prevents the cost of the swap from moving one basis point, or 0.01 percentage point, that equals about $1 million of profit for the dealer on a $500 million swap that matures in 20 years."

## DEFENDANTS ACTIVELY AND FRAUDULENTLY CONCEALED THEIR UNLAWFUL CONSPIRACY AND MANIPULATION

127. Plaintiff disclaims any burden to plead facts regarding the statute of limitations.

128. By its very nature, as alleged herein, the unlawful activity that Defendants engaged in was self-concealing. By Defendants' affirmative acts, misrepresentations, and nondisclosures, any applicable statute of limitations on claims asserted by Plaintiff and members of the Class have been and are tolled.

129. Plaintiff and members of the Class had no knowledge of the unlawful conduct alleged in this Complaint, or of any facts that could or would have led to the discovery thereof, until, at the earliest, April 2013 when news reports first reported that the CFTC was investigating

ICAP and the setting of the ISDAFIX rate. In the exercise of reasonable diligence, Plaintiff could not have discovered Defendants violations of law such that suit could be brought.

**COUNT I**
**PRICE FIXING**
**SECTION 1 OF THE SHERMAN ANTITRUST ACT**

130. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

131. The combination and conspiracy alleged herein is a *per se* violation of Section 1 of the Sherman Antitrust Act.

132. Alternatively, the combination and conspiracy alleged herein is a rule of reason violation of Section 1 of the Sherman Antitrust Act.

133. Defendants intended to and actually did restrain trade. They shared a conscious commitment to a common scheme designed to achieve the unlawful objective of artificially fixing, depressing, raising, pegging, maintaining, stabilizing, and otherwise manipulating the ISDAFIX rate.

134. The conspiracy unreasonably restrained trade. There is no legitimate business justification for, or procompetitive benefits caused by, Defendants' unreasonable restraint of trade. Any ostensible procompetitive benefit was pretextual or could have been achieved by less restrictive means.

135. Plaintiff and members of the Class have been injured in their business and property by reason of Defendants' violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.

136. Plaintiff and members of the Class are threatened with impending future injury to their business and property by reason of Defendants' continuing violation of Section 1 of the

Sherman Antitrust Act, 15 U.S.C. § 1, within the meaning of Section 16 of the Clayton Antitrust Act, 15 U.S.C. § 26.

**COUNT II**
**PRICE MANIPULATION**
**VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**7 U.S.C. §§1 ET SEQ. AND CFTC RULE 180.1(A))**

137. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

138. Defendants, through their acts alleged herein, specifically intended to and did cause unlawful and artificial prices of the ISDAFIX rate in violation of the CEA, 7 U.S.C. §1, *et seq.*

139. In violation of Commodity Futures Trading Commission ("CFTC") Rule 180.1(a), Defendants also caused to be delivered for transmission false or misleading or inaccurate reports of the ISDAFIX rate, *i.e.,* false reports concerning market information or conditions that affected or tended to affect the interest rate derivative and swaption transactions, which are commodities in interstate commerce.

140. Defendants did so either knowingly, intentionally or acting in reckless disregard of the fact that such reports were false, misleading or inaccurate.

141. In all the circumstances previously alleged, each Defendant individually had and all Defendants collectively had the ability to cause and did cause artificial prices.

142. Each Defendant is liable under Section 2(a)(l) of the CEA, 7 U.S.C. §2(a)(l), for the manipulative acts or omissions of their agents, employees or other persons acting on their behalf.

143. As a direct result of the foregoing, Plaintiff and members of the Class transacted at artificial and unlawful prices, and transacted in an artificial and manipulated market, during

the Class Period. Defendants' conduct is presumed to have caused injury to the Plaintiff and the Class.

144. Plaintiff and members of the Class were injured and are each entitled to their actual damages for the violations of the CEA.

**COUNT III**
**PRINCIPAL-AGENT LIABILITY**
**VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 1, *ET SEQ.***

145. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

146. Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. §2(a)(1), for the manipulative acts of their agents, representatives and/or other persons acting for them in the scope of their employment.

147. Plaintiff and members of the Class are each entitled to actual damages sustained for violations of the CEA.

**COUNT IV**
**AIDING AND ABETTING**
**VIOLATION OF THE COMMODITY EXCHANGE ACT, 7 U.S.C. § 1, *ET SEQ*.**

148. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

149. The Defendants each knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA by other Defendants as alleged herein. Each Defendant did so knowing of other Defendants' manipulation of the ISDAFIX rate and substantially and willfully intended to assist these manipulations to cause the prices of interest rate derivative and swaption transactions to be artificial during the Class Period, in violation of § 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l).

150. Under § 13 of the CEA, 7 U.S.C. §13, Defendants are liable for willfully intending to assist the manipulation.

151. Other persons willfully intended to assist these manipulations to cause the price of interest rate derivative and swaption transactions to reach artificial levels during the Class Period, in violation of Section 22(a)(l) of the CEA, 7 U.S.C. § 25(a)(l). They are the agents and unnamed coconspirators as alleged herein.

152. Plaintiff and members of the Class are each entitled to actual damages sustained for the violations of the CEA.

**COUNT V**
**UNJUST ENRICHMENT**

153. Plaintiff repeats and reasserts each of the preceding allegations as if fully set forth herein.

154. The Defendants each benefitted financially from their unlawful acts described herein, including, but not limited to, manipulating ISDAFIX rates. These unlawful acts caused Plaintiff and the Class to suffer injury, financial loss, and otherwise be deprived of the benefit of un-manipulated ISDAFIX rates, including receipt, upon execution or settlement of their interest rate derivative and/or swaption transactions, of less in value than they would have received in the absence of Defendants' wrongful conduct.

155. Due to the acts of Defendants and their co-conspirators as alleged in this Complaint, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

156. Plaintiff and the Class seek restitution of the monies and financial benefits of which they were unjustly deprived, as described herein, and have no adequate remedy at law.

WHEREFORE, Plaintiff, on behalf of itself and the Class, respectfully prays the Court for a judgment, as follows:

a. that the Court adjudge and decree that Defendants violated the Sherman Antitrust Act, 15 U.S.C. § 1, and enter joint and several judgments against Defendants in favor of Plaintiff and members of the Class;

b. that the Court adjudge and decree that Defendants violated the Commodities Exchange Act, 7 U.S.C. § 1, *et seq*. and enter joint and several judgments against Defendants in favor of Plaintiff and members of the Class;

c. that the Court Order that this action may be maintained as a class action pursuant to Rules 23(a) & (b) of the Federal Rules of Civil Procedure, that it be named a Class Representative, that the undersigned be named Class Counsel, and that reasonable notice of this action, as provided by Fed. R. Civ. P. 23(c)(2), be given to the Class;

d. that the Court award three times the damages suffered by reason of Defendants' violations of law;

e. that the Court award punitive damages;

f. that the Court cause Defendants to disgorge their ill-gotten gains to Plaintiff and members of the Class;

g. that the Court award reasonable costs of suit;

h. that the Court award pre- and post-judgment interest;

i. that the Court award reasonable attorney's fees; and

j. that the Court grants such other, further and different relief as is just and proper.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff

By: /s/ James E. Cecchi
JAMES E. CECCHI

Dated: October 17, 2014

Jay W. Eisenhofer
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500
***Counsel for Plaintiff and the Proposed Class***

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of itself and members of the proposed Class, hereby demands a trial by jury on all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
Attorneys for Plaintiff

By: /s/ James E. Cecchi
JAMES E. CECCHI

Dated: October 17, 2014

Jay W. Eisenhofer
Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500
***Counsel for Plaintiff and the Proposed Class***